

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
*********************************
                                *
Baybutt Construction Corporation *
                                *                    LTS
        v.                      *    Docket No. 04-10608-MLW
                                *
Town of Boxford                 *
                                *
*********************************
```

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Baybutt Construction Corporation ("Baybutt"), in support of its Motion for Summary Judgment, avers that the following material facts of record are undisputed:

1. On or about May 22, 2002 the Town and Baybutt entered into a written contract ("Contract") under which Baybutt would perform and the Town would pay for the work of the project known as the New Boxford Town Hall (the "Project") [Counterclaim and Reply ¶2].

2. The Contract provided for the assessment of liquidated damages against Baybutt in the amount of $1,000 per calendar day, for each day after the required substantial completion date that Baybutt had not achieved substantial completion of the Project work [Counter claim and Reply ¶5].

3. The Town has assessed liquidated damages in the amount of $110,00.00, allegedly as a result of Baybutt's failure to achieve the required substantial completion date [Counterclaim ¶9].

4. The parties' Contract contains the following clause:

> It is expressly understood and agreed, by and between the Contractor and Owner, that the time for the completion of the work described herein is a reasonable time for the completion of same, taking into consideration the average climatic range and usual industrial and/or residential conditions prevailing in this locality. If the said Contractor shall neglect, fail or refuse to complete the work within the times herein specified, or any proper extension thereof granted by the Owner, then the Contractor does hereby agree, as a part consideration for the awarding of this Contract, to pay to the Owner $1,000 not as a penalty but as liquidated damages for such breach of contract, for each and every calendar day that the Contractor shall be in default after the time stipulated for completing the work. The said amount is fixed and agreed upon by and between the Contractor and the Owner because of the impracticability and extreme difficulty of fixing and ascertaining the actual damages the Owner would in such event sustain, and said amount is agreed to be the amount of damages which the Owner should sustain and said amount shall be deducted by the Owner from periodic payments.

[Article 8.4.1, Addendum to Supplementary Conditions]

5.  Boxford hired J. Stewart Roberts Associates ("JSR") as the architect designing the Project. As part of its design, JSR hired a mechanical design firm to, *inter alia,* design the fire suppression system for the Project. [Benson deposition, Volume I, Tr. at 39-40]

6.  A design error was made in designing the fire suppression system. [Murphy Deposition, Tr. at 45-46]

7.  Due to this deficiency in design, the Town Administrator has conceded that Baybutt was entitled to extra time and/or money for rectifying the problem. [Benson deposition, Volume I, Tr. at 40]

8.  Baybutt requested an additional 45 days to complete its contract, due to this design error in the fire suppression system, which request was submitted to the Architect, but not approved by it. [Benson deposition, Volume I, Tr. at 45-46]

9. To date, Baybutt has not received a single extra day of completion time as a result of the fire suppression system problem. [Benson deposition, Volume I, Tr. at 48-49]

10. Boxford is no longer awaiting any approval from the Architect in order to approve additional money and/or time to Baybutt as a result of the fire pump issue. [Benson deposition, Volume I, Tr. at 53-54.

11. Boxford's Town Manager further concedes that some extension of time is in order based on this fire pump issue. [Benson deposition, Volume I, Tr. at 87-88]

12. In addition to the delays occasioned by the deficiency in design of the fire suppression system, Baybutt was delayed at "easily a couple of weeks" in waiting for JSR to respond in coming up with an additional design for the fire pump system. [Benson deposition, Volume I, Tr. at 92]

13. Boxford has withheld liquidated damages for 110 days from September 24, 2003 to January 12, 2004, respectively its claimed targeted substantial completion date and actual substantial completion date. [Benson deposition, Volume I, Tr. at 106-107]

Respectfully submitted,
BAYBUTT CONSTRUCTION COMPANY
By its attorneys,

HALL, MORSE, ANDERSON, MILLER & SPINELLA, P.C.

May 11, 2005

_____
Frank P. Spinella, Jr. #566536
14 Centre Street, P.O. Box 2289
Concord, NH 03302-2289
(603) 225-6655

- 4 -

## Certificate of Service

I hereby certify that a copy of the foregoing was forwarded this date to David J. Doneski, Esquire.

                                         _____
                                         Frank P. Spinella, Jr.

```
                                    Volume:        I
                                    Pages:       126
                                    Exhibits:     29
```

UNITED STATES OF AMERICA
UNITES STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * *
                           *
BAYBUTT CONSTRUCTION CORP., *
                           *   Civil Action
    Plaintiff,             *   No. 04-10608
                           *
v.                         *
                           *
TOWN OF BOXFORD,           *
    Defendant              *
                           *
* * * * * * * * * * * * * *
```

   DEPOSITION of **ALAN BENSON**, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Barbara Milne, a Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at the Boxford Town Hall, 7A Spofford Road, Boxford, Massachusetts, on Monday, December 20, 2004, commencing at 1:30 p.m.

William E. Beaupre, 145 Norfolk Ave., Swampscott, MA  01907
(781) 598-5286
*************** COMPUTER AIDED TRANSCRIPTION ***********

| | | |
|---|---|---|
| 1 | A | I recall a conversation with one member of the |
| 2 | | Board of Selectmen that I had related to |
| 3 | | construction law in Massachusetts that does, as |
| 4 | | you say, require that the architect answer |
| 5 | | claims of claims of failures in design. |
| 6 | Q | Who was that selectman? |
| 7 | A | Charles Costello. And we discussed that, and |
| 8 | | then we concluded that it was somewhat |
| 9 | | irrelevant, because in the end the town always |
| 10 | | pays. |
| 11 | Q | Has JSA ever acknowledged to you any deficiency |
| 12 | | in their design of this job? |
| 13 | A | Verbally, Phil has acknowledged to me on at |
| 14 | | least two occasions of design deficiency which |
| 15 | | he attributes to other groups of the design |
| 16 | | team. |
| 17 | Q | And what are those two occasions? |
| 18 | A | The first was related to the elevation issue of |
| 19 | | the sidewalks, and the second was related to |
| 20 | | the fire suppression system. |
| 21 | Q | Let's talk about the fire suppression system |
| 22 | | first. Did Mr. O'Brien blame a particular |
| 23 | | member of the design team for that deficiency? |
| 24 | A | A firm, not a person. |

40

| | | |
|---|---|---|
| 1 | Q | Which firm? |
| 2 | A | The mechanical design firm. It has three |
| 3 | | letters, BES. |
| 4 | | MR. DONESKI: BER. I'm sorry. |
| 5 | | THE WITNESS: BER. |
| 6 | Q | And when did Mr. O'Brien say this to you? |
| 7 | A | After a job meeting in October. No, I'm sorry. |
| 8 | | Let me correct that. At a Building Committee |
| 9 | | meeting in October of 2003. |
| 10 | Q | As a result of that acknowledgement by JSA, did |
| 11 | | you personally feel that Baybutt was entitled |
| 12 | | to extra time and/or money for rectifying the |
| 13 | | problem? |
| 14 | A | Yes. |
| 15 | Q | And, in fact, a change order was issued on a |
| 16 | | time and materials basis to rectify the |
| 17 | | problem, correct? |
| 18 | A | No, it was not a change order. |
| 19 | Q | What was it? |
| 20 | A | I had never seen the document before. It was a |
| 21 | | different form. |
| 22 | Q | Supplemental Instruction form? |
| 23 | A | That sounds familiar. I can't -- |
| 24 | | MR. SPINELLA: Why don't you mark this |

45

```
1        between the time information was first sought
2        and the October 24 directive to proceed?
3    A   I have a sense that this was a significant
4        issue and was not receiving sufficient timely
5        response from JSR. I have a memory of
6        contacting JSR on that issue, more than once,
7        to inform them that it was the town's clear
8        requirement that response be forthcoming
9        immediately.
10   Q   And what was the response you ultimately
11       received to that communication?
12   A   To all of my communications, there was some
13       response. To many of my communications, there
14       was not complete response. In addition, as
15       time evolved, Baybutt increased their questions
16       and concerns that they needed responses to.
17       So, this was not a situation of one document or
18       one request that was unanswered. This was a
19       series of requests with additional information
20       each time. I involved myself very much in
21       this.
22   Q   What, if anything, happened to Baybutt's
23       request for additional time of 45 days?
24   A   At some point, that request became part of what
```

|    |   |                                                                    |
|----|---|--------------------------------------------------------------------|
| 1  |   | we refer to as Change Order Proposal 50. And                       |
| 2  |   | Change Order Proposal 50 has never been                            |
| 3  |   | approved by the architect.                                         |
| 4  | Q | Does that surprise you?                                            |
| 5  | A | Yes.                                                               |
| 6  | Q | The architect had told you in October that a                       |
| 7  |   | member of its design team blew it, right?                          |
| 8  |   | MR. DONESKI: Objection to the form.                                |
| 9  | Q | I'll withdraw it. Your architect had told you                      |
| 10 |   | in October of 2003 that a member of its design                     |
| 11 |   | team had misdesigned this issue, correct?                          |
| 12 | A | Correct.                                                           |
| 13 | Q | And as a result of that admission, did you not                     |
| 14 |   | feel that JSA would or should approve Change                       |
| 15 |   | Order 50?                                                          |
| 16 | A | I believed at that time that JSA would approve                     |
| 17 |   | a negotiated amount for Change Order 50.                           |
| 18 | Q | Both dollars and days?                                             |
| 19 | A | Both dollars and days.                                             |
| 20 | Q | Do you have any concerns with the dollars or                       |
| 21 |   | the days sought by Baybutt?                                        |
| 22 | A | Yes.                                                               |
| 23 | Q | Tell me what your concerns are.                                    |
| 24 | A | It was explained to me that it would be                            |

```
                                                              48
 1          some date in October related to this sprinkler
 2          system.
 3     Q    Without a credit for the deleted aspects of its
 4          original scope of work?
 5     A    And without a credit for work that had yet to
 6          be completed on the original project and
 7          without a credit for work that was not
 8          completed on the original project.
 9     Q    How did you gather that opinion?  Was that from
10          speaking with Dick Murphy?
11     A    In a conversation -- yes.  And in a rather
12          direct review of the documents that were
13          provided of Change Order 50 with Dick present.
14     Q    Would it be fair to say you're relying on his
15          opinion on this, as opposed to your own
16          independent review of the issue, in determining
17          that Baybutt was not entitled to everything it
18          asked for?
19     A    No, I had independently concluded that the
20          requests were beyond what I understood to be
21          appropriate in this situation.
22     Q    Would you agree with me that at least as of
23          today, Baybutt has not been paid a cent, nor
24          given an extra day of completion time, as a
```

| | | |
|---|---|---|
| 1 | | result of this fire suppression system problem? |
| 2 | A | I would agree. |
| 3 | Q | What has to happen, in your mind, in order to |
| 4 | | determine how much money and time Baybutt is |
| 5 | | entitled to as a result of this problem? |
| 6 | A | I have remained under the impression and the |
| 7 | | understanding that in order to close out Change |
| 8 | | Order 50, a number needs to be certified by the |
| 9 | | architect for Change Order 50, that that needs |
| 10 | | to make it onto a requisition that is approved |
| 11 | | by the architect, that the town then puts |
| 12 | | forward and pays. |
| 13 | Q | Would you agree with me that every nickel |
| 14 | | approved for Change Order 50 by the architect |
| 15 | | adds a nickel to the town's potential claim |
| 16 | | against the architect for the design problem? |
| 17 | A | Yes. |
| 18 | Q | Tell me why you expect the architect ever to |
| 19 | | approve a nickel on Change Order 50, or do you? |
| 20 | A | Why do I? |
| 21 | Q | Do you, first of all, expect the architect will |
| 22 | | ever approve a nickel on Change Order 50? |
| 23 | A | I truly believed, in December, January, and |
| 24 | | February, that that indeed was the case, |

53

1   A   Yes.
2   Q   And there is a procedure in the AIA form for
3       contractor initiated change order requests or
4       proposals?  Are you familiar with that?
5   A   Yes.
6   Q   Back to Exhibit 9, just focusing on the Change
7       Order 50 narrative from Dick Murphy, my
8       question is simply this.  On review of it now,
9       Alan, is this Mr. Murphy's view, the town's
10      view, Phil O'Brien's view, or someone else's
11      view?
12  A   Mr. Murphy's.
13  Q   Do you know whether the town has adopted it as
14      its position with respect to Change Order 50?
15  A   The town has not adopted an amount or a number
16      of days related to Change Order 50.
17  Q   If the town ultimately does approve additional
18      money and/or additional time to Baybutt as a
19      result of the fire pump issue, will it only be
20      after the architect signs off?
21  A   No.
22  Q   So, you're not waiting on the architect to
23      bless dollars or days anymore; is that a fair
24      statement?

1    A    That's a fair statement.
2    Q    What are you waiting for?
3    A    The town sent a letter to Baybutt that clearly
4         indicated that we wished to close out the
5         project and to reach agreement on all
6         outstanding change order proposals, and we
7         wished Baybutt to perform a certain list of
8         tasks as a precursor to the commencement of
9         those settlement negotiations.  And I believe
10        we are down to three outstanding issues.
11   Q    What are those?
12   A    The doors, the heating system, and the building
13        leaks.
14   Q    By the doors, you mean the curling or warping
15        of the wood?
16   A    The deficiency of the doors, yes.
17   Q    Has Baybutt communicated to you its view that
18        the humidity level in this building is simply
19        too low?
20   A    Yes.
21   Q    Has the town taken a position on that?
22   A    The town felt we had reached an agreement in
23        principle with Baybutt and the door
24        manufacturer at a meeting that Baybutt arranged

87

|    |   |                                                                 |
|----|---|-----------------------------------------------------------------|
| 1  |   | the building are warranty issues, that the                      |
| 2  |   | doors are warranty issues. I guess I want to                    |
| 3  |   | distinguish that that doesn't mean there aren't                 |
| 4  |   | -- let's use the positive. There are door                       |
| 5  |   | issues on the punch list, because they've never                 |
| 6  |   | been right, which is -- which is somewhat                       |
| 7  |   | different. The doors behind me, when they put                   |
| 8  |   | the coat hooks in, they drilled the screws too                  |
| 9  |   | long and actually punched the screws out the                    |
| 10 |   | other side of the doors. They never replaced                    |
| 11 |   | the panels in the doors. That's not the                         |
| 12 |   | architect's fault.                                              |
| 13 | Q | Agreed. And I take it you've got a monetized                    |
| 14 |   | punch list that would attribute a value to all                  |
| 15 |   | these things?                                                   |
| 16 | A | Correct.                                                        |
| 17 | Q | And the total is what retainage you are                         |
| 18 |   | holding?                                                        |
| 19 | A | That is correct.                                                |
| 20 | Q | Just looking at your letter, Exhibit 12, your                   |
| 21 |   | March 24 letter to Fred, I notice you say                       |
| 22 |   | Baybutt is entitled to release of all retainage                 |
| 23 |   | less remaining uncompleted items on the                         |
| 24 |   | monetized punch list and liquidated damages due                 |

88

| | | |
|---|---|---|
| 1 | | the town caused by Baybutt's failure to achieve |
| 2 | | substantial completion by the date required. |
| 3 | | Would you agree with me that some extension of |
| 4 | | time may well be in order based on Change Order |
| 5 | | 50 and the fire pump issue? |
| 6 | A | Yes. |
| 7 | Q | You have no sense as you sit here today, I take |
| 8 | | it, as to how much time? |
| 9 | A | I told you that I could easily see that at |
| 10 | | least the last two weeks before substantial |
| 11 | | completion were solely attributed to the fire |
| 12 | | suppression system. |
| 13 | Q | Do you feel that any time was lost by Baybutt |
| 14 | | while waiting for a response from JSA on this |
| 15 | | issue? |
| 16 | A | On the fire pump issue? |
| 17 | Q | That's right. |
| 18 | A | No.  That issue, more than some of the others, |
| 19 | | the town leapt on very quickly.  And |
| 20 | | authorizations, even absent authorizations from |
| 21 | | JSA, were given.  I'll give you an example. |
| 22 | | One of the key issues was the removal of the |
| 23 | | equipment that was in the building but now |
| 24 | | needed to be retrofitted in Canada.  That was |

92

1          to stop dead due to the absence of such
2          direction?
3     A    I agree that these e-mails do use that
4          terminology when I was talking to JSR, yes.
5     Q    Are they inaccurate in that respect?
6     A    Again, Baybutt was working -- excuse me.  The
7          town was working closely with Baybutt to try to
8          get JSR to get the documentation.  Baybutt was
9          also working diligently to try to solve the
10         problem.  As I recall, this third e-mail, I was
11         also frustrated with the contractor for having
12         canceled the order.  It was the correct sized
13         system.  It was the ultimate system that was
14         used.
15    Q    Had JSR been responsive in coming up with the
16         additional designs needed for the fire pump,
17         would Baybutt have started the fire pump
18         sooner?
19    A    Yes.
20    Q    How much sooner?
21    A    Easily a couple of weeks.
22    Q    Let's go back to Exhibit 12, your letter to
23         Fred on March 24th, if you have that handy.
24         Page 2, where there's a discussion on Change

106

|   |   |   |
|---|---|---|
| 1 |   | March, the LDs, and the uncompleted work.  I |
| 2 |   | just want to be on the same sheet of music, |
| 3 |   | because David's confusion is my confusion, |
| 4 |   | actually.  Would it be fair to say that the |
| 5 |   | retainage is really in six figures, but |
| 6 |   | consumed by two things, the LDs and uncompleted |
| 7 |   | work? |
| 8 | A | The difference between the total of the base |
| 9 |   | contract and all of the change orders that were |
| 10 |   | approved, and what has been paid, is in the six |
| 11 |   | figures.  I do not consider liquidated damages |
| 12 |   | withheld retainage.  I have said that several |
| 13 |   | times to subcontractors of Baybutt who have |
| 14 |   | called me on the issue, so I'm sure you've |
| 15 |   | heard it, but as far as I'm concerned, we've |
| 16 |   | paid, Change Order 50 aside, everything.  We're |
| 17 |   | due the 100 for liquidated damages, less |
| 18 |   | whatever ends up being the days, and this |
| 19 |   | $46,000 punch list items that are not -- that |
| 20 |   | as of this date were not completed. |
| 21 | Q | The 110 days of delay go from when to when?  Is |
| 22 |   | that September 24 to January 12th? |
| 23 | A | Yes. |
| 24 | Q | September 24 being the substantial completion |

107

1      target as extended?

2  A   Correct.

3  Q   And January 12th being the date substantial

4      completion was achieved?

5  A   Correct.

6  Q   Wasn't substantial completion achieved when the

7      certificate of occupancy issued on January 6th?

8  A   Was it the 6th or 9th?  I don't know.

9                *

10      (Exhibit No. 22, Note, 1/6/04, Benson

11      to Ward, was Marked for

12      Identification.)

13                *

14  Q   I show you Benson Exhibit 22.  Can you tell me

15      what that is, please?

16  A   This is a handwritten note from me to Ken Ward,

17      the Inspector of Buildings, authorizing him to

18      issue a temporary occupancy permit.  Ken had

19      informed me that his interpretation of the

20      building code required the owner to request a

21      temporary occupancy permit in order to get a

22      temporary occupancy permit, so --

23  Q   And when did you learn that?

24  A   That afternoon I wrote this note.