UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04 10608-MLW

| | |
|---|---|
| BAYBUTT CONSTRUCTION CORPORATION,<br><br>Plaintiff<br><br>v.<br><br>TOWN OF BOXFORD,<br><br>Defendant | DEFENDANT'S STATEMENT OF MATERIAL FACTS IN DISPUTE AND RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE |

In connection with its opposition to the motion of the plaintiff, Baybutt Construction Corporation ("Baybutt"), for partial summary judgment, the defendant, Town of Boxford ("Town"), states that there is a genuine issue to be tried with respect to the following material facts:

1. Whether the time it took the project architect, J. Stewart Roberts Associates, to address deficiencies in the design of the fire suppression system and respond to inquiries from Baybutt regarding performance of the work for that system delayed Baybutt's performance of other work elements for the Boxford Town Hall project. [Transcript of Deposition of Alan Benson, vol. I, pp. 88-92]

The Town responds to Baybutt's Statement of Material Facts Not in Dispute as follows:

¶¶3, 13. Although the computed number of days of delay is 110, the Town has assessed only $100,000 for liquidated damages. [Benson deposition, vol. I, p.104-105, Ex. 12]

¶12.   The delay of "a couple of weeks" testified to by Mr. Benson was the delay in Baybutt starting the so-called fire pump work. Mr. Benson did not testify that that period of time was "in addition to" any other delays.

TOWN OF BOXFORD
By its attorney

*/s/ David J. Doneski*
David J. Doneski (BBO#546991)
Kopelman and Paige, P.C.
 Town Counsel
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

253014/BOXF/0059

26

1    that I did not feel that there were periods of
2    time where work was not accomplished because of
3    any lacking information.
4  Q  Are you familiar with critical path analysis
5    for construction projects?
6  A  Only the term.
7  Q  All right. Let me take a shot at this. There
8    are some projects which have a critical path,
9    which means that in order for the next task to
10   be accomplished, the prior task has to be
11   completed. And so on, from beginning to end of
12   the project, while other things off the
13   critical path can, at the option of the
14   contractor, be completed concurrently, without
15   waiting on the next critical path item, if you
16   will -- if you understand what I'm saying.
17 A  I follow that.
18 Q  So, the fact that there's work ongoing on a
19   site cannot alone tell you whether the overall
20   project is delayed. You need to know whether
21   that work on site is on or off the critical
22   path. Do you follow me so far?
23 A  I do.
24 Q  With that sort of armchair definition of the

1    we refer to as Change Order Proposal 50. And
2    Change Order Proposal 50 has never been
3    approved by the architect.
4  Q  Does that surprise you?
5  A  Yes.
6  Q  The architect had told you in October that a
7    member of its design team blew it, right?
8        MR. DONESKI: Objection to the form.
9  Q  I'll withdraw it. Your architect had told you
10    in October of 2003 that a member of its design
11    team had misdesigned this issue, correct?
12 A  Correct.
13 Q  And as a result of that admission, did you not
14    feel that JSA would or should approve Change
15    Order 50?
16 A  I believed at that time that JSA would approve
17    a negotiated amount for Change Order 50.
18 Q  Both dollars and days?
19 A  Both dollars and days.
20 Q  Do you have any concerns with the dollars or
21    the days sought by Baybutt?
22 A  Yes.
23 Q  Tell me what your concerns are.
24 A  It was explained to me that it would be

53

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And there is a procedure in the AIA form for |
| 3 | | contractor initiated change order requests or |
| 4 | | proposals?  Are you familiar with that? |
| 5 | A | Yes. |
| 6 | Q | Back to Exhibit 9, just focusing on the Change |
| 7 | | Order 50 narrative from Dick Murphy, my |
| 8 | | question is simply this.  On review of it now, |
| 9 | | Alan, is this Mr. Murphy's view, the town's |
| 10 | | view, Phil O'Brien's view, or someone else's |
| 11 | | view? |
| 12 | A | Mr. Murphy's. |
| 13 | Q | Do you know whether the town has adopted it as |
| 14 | | its position with respect to Change Order 50? |
| 15 | A | The town has not adopted an amount or a number |
| 16 | | of days related to Change Order 50. |
| 17 | Q | If the town ultimately does approve additional |
| 18 | | money and/or additional time to Baybutt as a |
| 19 | | result of the fire pump issue, will it only be |
| 20 | | after the architect signs off? |
| 21 | A | No. |
| 22 | Q | So, you're not waiting on the architect to |
| 23 | | bless dollars or days anymore; is that a fair |
| 24 | | statement? |

```
1    A    That's a fair statement.
2    Q    What are you waiting for?
3    A    The town sent a letter to Baybutt that clearly
4         indicated that we wished to close out the
5         project and to reach agreement on all
6         outstanding change order proposals, and we
7         wished Baybutt to perform a certain list of
8         tasks as a precursor to the commencement of
9         those settlement negotiations.  And I believe
10        we are down to three outstanding issues.
11   Q    What are those?
12   A    The doors, the heating system, and the building
13        leaks.
14   Q    By the doors, you mean the curling or warping
15        of the wood?
16   A    The deficiency of the doors, yes.
17   Q    Has Baybutt communicated to you its view that
18        the humidity level in this building is simply
19        too low?
20   A    Yes.
21   Q    Has the town taken a position on that?
22   A    The town felt we had reached an agreement in
23        principle with Baybutt and the door
24        manufacturer at a meeting that Baybutt arranged
```

88

1        the town caused by Baybutt's failure to achieve
2        substantial completion by the date required.
3        Would you agree with me that some extension of
4        time may well be in order based on Change Order
5        50 and the fire pump issue?
6  A  Yes.
7  Q  You have no sense as you sit here today, I take
8        it, as to how much time?
9  A  I told you that I could easily see that at
10       least the last two weeks before substantial
11       completion were solely attributed to the fire
12       suppression system.
13  Q  Do you feel that any time was lost by Baybutt
14       while waiting for a response from JSA on this
15       issue?
16  A  On the fire pump issue?
17  Q  That's right.
18  A  No.  That issue, more than some of the others,
19       the town leapt on very quickly.  And
20       authorizations, even absent authorizations from
21       JSA, were given.  I'll give you an example.
22       One of the key issues was the removal of the
23       equipment that was in the building but now
24       needed to be retrofitted in Canada.  That was

                                                                89

```
 1         shipped, put together, without any documents
 2         from JSA.
 3    Q    By whom?
 4    A    By Baybutt and shipped, because all parties
 5         believed that it was necessary that it get
 6         there, get retrofitted, and get back.
 7    Q    So, you're giving me an example of something
 8         where -- which Baybutt took it upon itself,
 9         without waiting for JSA's approval to start,
10         because it's a long lead time item?
11    A    Correct.
12    Q    But that really doesn't answer my question.  My
13         question is do you feel that Baybutt lost time
14         while waiting for an approval.
15              MR. DONESKI:  For clarity, could you
16         specify what you mean, lost time?
17    Q    Sure.  Do you feel that -- fair enough.  Do you
18         feel that Baybutt was delayed in working on the
19         fire pump issue by the absence of response from
20         JSA?
21    A    May I say something and ask you to rephrase?
22         It is my impression, during that time, that
23         Baybutt made strong efforts to not be delayed.
24         They made efforts to get things done.  The
```

90

1   town, as the owner, helped them do that.
2   That's why I'm having trouble answering your
3   question. I cannot think of an instance where
4   JSA's late response caused Baybutt to not
5   accomplish the goal.
6                              *
7              (Exhibit No. 13, E-Mail, 10/23/03, was
8              Marked for Identification.)
9                              *
10             (Exhibit No. 14, E-Mail, 10/29/04, was
11             Marked for Identification.)
12                             *
13             (Exhibit No. 15, E-Mail, 11/5/03, was
14             Marked for Identification.)
15                             *
16  Q   Let me show you, Alan, an e-mail that you
17      apparently sent to Phil O'Brien on October 23.
18      Do you recognize it as such?
19  A   Yes.
20  Q   What was your purpose in sending it?
21  A   To motivate J. Stewart Roberts to respond to
22      multiple requests from Baybutt.
23  Q   I'm now showing you Benson Exhibit 14, which
24      purports to be an October 29, 2003, memo from

```
1           you to JSR.  Do you recognize it as such?
2      A    Yes.
3      Q    The purpose in sending it was what?
4      A    The same general purpose, more specific in this
5           e-mail.  JSR had sent a useless document to
6           Baybutt, because it had been faxed repeatedly,
7           of the design, and upon hearing Baybutt's
8           frustration, I sent this e-mail as the owner to
9           JSR, requesting that they provide a document
10          that could be interpreted.
11     Q    I'm now showing you a November 5, 2003, e-mail
12          from you to Phil O'Brien.  Do you recognize
13          this document as such an e-mail?
14     A    Yes.
15     Q    And your purpose?
16     A    Again, the general purpose of motivating JSR to
17          provide appropriate information to Baybutt.
18          This one was also an expression of my
19          frustration with all parties, including the
20          contractor.
21     Q    Would you agree with me that in reading these
22          three e-mails, there are indications that
23          Baybutt could not proceed without further
24          direction and, indeed, in the last e-mail had
```

92

| | | |
|---|---|---|
| 1 | | to stop dead due to the absence of such |
| 2 | | direction? |
| 3 | A | I agree that these e-mails do use that |
| 4 | | terminology when I was talking to JSR, yes. |
| 5 | Q | Are they inaccurate in that respect? |
| 6 | A | Again, Baybutt was working -- excuse me.  The |
| 7 | | town was working closely with Baybutt to try to |
| 8 | | get JSR to get the documentation.  Baybutt was |
| 9 | | also working diligently to try to solve the |
| 10 | | problem.  As I recall, this third e-mail, I was |
| 11 | | also frustrated with the contractor for having |
| 12 | | canceled the order.  It was the correct sized |
| 13 | | system.  It was the ultimate system that was |
| 14 | | used. |
| 15 | Q | Had JSR been responsive in coming up with the |
| 16 | | additional designs needed for the fire pump, |
| 17 | | would Baybutt have started the fire pump |
| 18 | | sooner? |
| 19 | A | Yes. |
| 20 | Q | How much sooner? |
| 21 | A | Easily a couple of weeks. |
| 22 | Q | Let's go back to Exhibit 12, your letter to |
| 23 | | Fred on March 24th, if you have that handy. |
| 24 | | Page 2, where there's a discussion on Change |

```
                                                              104

 1                              *
 2            (Exhibit No. 21, E-Mail, 3/29/04, was
 3            Marked for Identification.)
 4                              *
 5    Q    Sorry.  Let me now show you what's been marked
 6         as Benson Exhibit 21, which appears to be an e-
 7         mail that you sent to Fred Baybutt dated March
 8         29, 2004.  Do you recognize it as such?
 9    A    Uh-hum.
10    Q    There's a reference to a $66,000 and change
11         payment.  Do you see that?
12    A    Uh-hum.
13    Q    Would you agree that's the last check that
14         Baybutt ever got from the town?
15    A    Yes.
16    Q    It references $100,000 for liquidated damages,
17         along with 46,000 and change for the
18         uncompleted items as being withheld from the
19         retainage, yielding a balance due of
20         $66,920.25, right?
21    A    Yes.  The way I remember the computation, we
22         literally looked at what was remaining unpaid
23         in the compilation of the base contract and all
24         change orders that had been issued.  The -- we
```

```
                                                                    105
 1         subtracted from that what we understood to be
 2         the monetized punch list of $46,665 and the
 3         100,000 which apparently incorrectly I had
 4         determined as the liquidated damages.
 5    Q    Why incorrectly?
 6    A    I have been told it's 110 days.  And subtracted
 7         that from the -- from that number and came up
 8         with the $66,000, and we issued that check.
 9    Q    So, retainage is being withheld for two
10         reasons, liquidated damages and a monetized
11         punch list as yet unattended to; is that right?
12              MR. DONESKI:  I'll object to the form.
13         Could you just rephrase that, since we've
14         been using the word retainage in the more
15         technical sense?  We're talking about
16         breaking out two items, but they're not
17         nominated here as both being retainage.
18         That's my only objection.
19    Q    All right.  Let me start over.  Alan, you told
20         us earlier you thought the retainage was
21         $40,000 or so based on the uncompleted work.
22         This memo characterizes retainage as $213,000,
23         from which -- which I can divide into three
24         parts, the 66 and change you paid Baybutt in
```

| | | |
|---|---|---|
| 1 | | March, the LDs, and the uncompleted work. I |
| 2 | | just want to be on the same sheet of music, |
| 3 | | because David's confusion is my confusion, |
| 4 | | actually. Would it be fair to say that the |
| 5 | | retainage is really in six figures, but |
| 6 | | consumed by two things, the LDs and uncompleted |
| 7 | | work? |
| 8 | A | The difference between the total of the base |
| 9 | | contract and all of the change orders that were |
| 10 | | approved, and what has been paid, is in the six |
| 11 | | figures. I do not consider liquidated damages |
| 12 | | withheld retainage. I have said that several |
| 13 | | times to subcontractors of Baybutt who have |
| 14 | | called me on the issue, so I'm sure you've |
| 15 | | heard it, but as far as I'm concerned, we've |
| 16 | | paid, Change Order 50 aside, everything. We're |
| 17 | | due the 100 for liquidated damages, less |
| 18 | | whatever ends up being the days, and this |
| 19 | | $46,000 punch list items that are not -- that |
| 20 | | as of this date were not completed. |
| 21 | Q | The 110 days of delay go from when to when? Is |
| 22 | | that September 24 to January 12th? |
| 23 | A | Yes. |
| 24 | Q | September 24 being the substantial completion |




# TOWN OF BOXFORD

*Office of the Board of Selectmen*
7A Spofford Road
Boxford, MA 01921

Tel: (978) 887-6000 Ext. 502
Fax: (978) 887-5361

March 24, 2004

Fred Baybutt, President
Baybutt Construction Corp.
PO Box 463
25 Avon Street
Keene, NH 03431-0463

Re: Boxford Town Hall Project

Certified Mail: 7001-1940-0005-4074-0033

Dear Fred:

In reviewing several pieces of e-mail correspondence from Baybutt, your frustration with the slow progress on the closeout of this project is clear. The Town is also highly frustrated with the lack of resolution on several closeout issues as well. Additionally, I interpreted the language in some of the e-mails to indicate some confusion on the Town's stance on the unresolved issues. In the interest of accelerating the project's finalization, I wish to provide you with a written summary of the Town's position.

## RELEASE OF RETAINAGE

Baybutt is entitled to release of all retainage LESS remaining uncompleted items on the monetized punch list AND liquidated damages due the Town caused by Baybutt's failure to achieve substantial completion by the date required under the contract, amended by change orders to September 24, 2003. Substantial completion was achieved on January 12, 2004; 100 calendar days late. Pursuant to the Contract, (see Amendment to Supplementary Conditions section 8.4.1.) the Town has assessed $1,000 per calendar day. Your firm was given advance



Fred Baybutt
President of Baybutt Construction Corp.
March 24, 2004
Page 2

written notice of the Town's intentions in a letter to you sent by the Architect, dated September 15, 2003. **On this issue, the Town's position has not changed.**

The Town anticipates immediate receipt of a re-submitted, certified requisition #23 that will not list as yet unaccepted change order proposals as agreed to in an e-mail from Fred Baybutt dated March 19, 2004. Therefore, on Friday, March 26, 2004, the Town, through the Architect, will review for acceptance those punch list items marked by Baybutt as completed, identify any in dispute, and confirm by e-mail our intentions for payment on requisition #23 less adjusted value of the punch list and less assessed liquidated damages. A check to Baybutt for payment on requisition #23 will be available on Wednesday, March 31, 2004.

### Change Order Proposal #50

Currently Change Order Proposal #50 is the aggregate total of previous change order proposals #50 and #76. The total requested is $152,285. In a letter to Baybutt dated February 6, 2004, the Architect rejected Change Order Proposals #50 and #76 because of 1) inclusion in the back-up of items that were not for additional work and items that were not for this project at all and 2) his interpretation that a conflict existed in the documents regarding of the size of the vault and therefore Baybutt was responsible to carry the larger size, consequently eliminating a vast majority of Baybutt's monetary claims. In that letter, the Architect requested that Baybutt "resubmit this COP without additional charges for work called for in the documents, credits for work called for in the documents that was not done."

On March 3, 2004, John Baybutt verbally informed the Architect and me that Baybutt would not comply with the Architect's request and demanded a job meeting with the Architect, the Clerk and Baybutt to review the submitted COP.

It is the Town's intention to fully compensate Baybutt for all additional work for which it is entitled pursuant to the contract, related to the re-construction of the fire tank vault. **On this issue, the Town's position has not changed.** Some amount LESS THAN $152,285 is clearly due Baybutt. In order to facilitate the final determination of an appropriate amount for COP #50, the Town intends to direct the Architect to determine the maximum undisputed value for the COP that can be paid by the Town. Any additional value disputed by Baybutt would be subject to further negotiation as described below.

Fred Baybutt
President of Baybutt Construction Corp.
March 24, 2004
Page 3

### Commencement of Negotiations on Rejected Change Order Proposals in Dispute

As you and I discussed at the job meeting December 11, 2003, Baybutt asserts certain claims for additional work under Change Order Proposals (COPs) which have been rejected by the Architect and remain in dispute. I informed you that day of the Town's intention and willingness to negotiate a settlement of those disputed COPs "when the job is complete." At a job meeting on February 5, 2004, John Baybutt requested the Town now proceed to schedule the promised settlement discussion. At that meeting, I repeated the Town's willingness to negotiate settlement of disputed items and responded with a list of crucial unresolved issues that are of critical importance to the owner, constituting "finishing the job," that needed Baybutt's attention PRIOR to the commencement of settlement discussions. **On this issue, the Town's position has not changed.** (Please understand that this designation of a handful of uncompleted tasks does not relieve Baybutt of its obligation to complete all items on the punch list; it is merely to identify the items that are an impediment to commencement of successful negotiations on rejected COP's)

My understanding of the status of those "critical" issues is as follows:

**Adjustment of the coiling doors.** Baybutt provided on-site assistance of the manufacturer's regional sales representatives and significant adjustments were made. The adjustments are acceptable to the Town at this time.

**Repair/replacement of badly warped and damaged interior doors.** Alarmingly, a substantial number of the interior doors appear to exhibit some combination of manufacturing, workmanship and installation defects. Baybutt arranged for an on-site visit by manufacturer's representatives and representatives of hardware installation firm. Discussions were positive and cordial. HOWEVER, in the time since that meeting, no doors have been replaced, no door hardware has been adjusted, no written intentions of Baybutt, of the door manufacturer or the hardware installation firm have been received. More is required.

**Repair of the leak in the roof over room 106.** Subsequent to the leak in the roof observed during a public meeting on February 3, 2004, Baybutt made repairs to the roof and has verbally indicated further repairs are scheduled. Subsequent to Baybutt's completion of those repairs, the Town needs assurance, either through a third party testing agency conducting flood tests or a

Fred Baybutt
President of Baybutt Construction Corp.
March 24, 2004
Page 4

form of guarantee acceptable to the Town, that these repairs are sufficient to eliminate further leaks.

**Adjustment of the balancing of the heating system.** The submitted balancing report was rejected by the Architect. Adjustments need to be made, a new balance test is to be completed and a new report needs to be submitted for acceptance. Filed subcontractor Snowden has been on site two or three times to attempt to make needed adjustments, but there has been negligible improvement in the even distribution of the building's heat. The current heat distribution condition is completely unacceptable to the Town and as I stated at the meeting on February 5, 2005, the Town will hold Baybutt responsible for any costs associated with employee grievances that arise.

I trust this letter delineates for you the Town's current position on the outstanding closeout issues.

On behalf of the Board of Selectmen,

Alan J. Benson, Town Administrator

cc:   Philip O'Brien, J. Stewart Roberts Associates
      Richard Murphy, Clerk of Works
      Boxford Town Counsel
      Boxford Board of Selectmen
      Boxford Town Hall Building Committee